UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-10901-RGS

DR. JENNIFER USIAK ALTSHULER

v.

ANIMAL HOSPITALS, LTD. d/b/a THE ANIMAL HOSPITAL OF LYNNFIELD,
and DR. CHRISTOPHER MEEHL

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

October 31, 2012

STEARNS, D.J.

Plaintiff veterinarian Dr. Jennifer Usiak Altshuler (Dr. Usiak, as that is her professional name) brought this lawsuit against her former employer, Animal Hospitals Ltd., d/b/a The Animal Hospital of Lynnfield (AHL), and its president, Dr. Christopher Meehl.  The gist of the Complaint involves Dr. Meehl's failure to make timely deposits of withheld contributions to Dr. Usiak's Simple IRA retirement savings account.  Dr. Usiak also brings a claim of retaliatory discharge in violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1002 et seq.  Having completed discovery, the parties now each move for summary judgment.

BACKGROUND

Dr. Meehl and his wife, LuAnn, are the owners of AHL, a small veterinary

hospital that employs four doctors and a full-time staff of fewer than twenty people. In April of 2007, Dr. Usiak joined AHL as a relief veterinarian. She became a full time employee in June of 2007.[1]  In April of 2009, Dr. Usiak elected to participate in a Simple IRA retirement plan sponsored by AHL. Dr. Meehl served as the plan administrator.[2]  Dr. Usiak chose to contribute $250 biweekly to her plan account.[3]

Under the terms of the plan, AHL was required to deposit an employee's contribution into his or her plan account within 30 days of the month in which the employee deduction was made.[4]  At the beginning of 2011, Dr. Usiak discovered that AHL had deposited into her account only 65% of the money withheld from her pay in 2010, and that the contributions for September, October, and November were overdue.

On January 6, 2011, Dr. Usiak spoke with Ellen Saltzman, AHL's business manager, about the missing deposits. Saltzman directed Dr. Usiak to Brian Haley, AHL's bookkeeper, who then happened to be on the premises.[5]  Haley told Dr. Usiak

---

[1] Dr. Usiak was at all times an at-will employee.

[2] The plan funds were invested with The Vanguard Group.

[3] AHL elected to make the maximum 3% (of annual salary) matching contribution to Dr. Usiak's retirement account.

[4] AHL deposited its employer contribution simultaneously with the monthly employee contributions, rather than at the end of the year as permitted by the plan.

[5] Haley visited the hospital once or twice a month to do AHL's books.

2

that he had been pressing Dr. Meehl to make more timely deposits to the retirement accounts.

Dr. Usiak then approached Dr. Meehl.  He apologized for being late with the deposits.  He stated that the recession had adversely impacted AHL's business,[6] and that his primary concern had been to protect the jobs of AHL's employees.[7]  Dr. Meehl promised to work with Haley to bring the accounts up to date, although he could not guarantee that all future deposits would be made on time.  On January 17, 2011, Dr. Usiak withdrew from the AHL retirement plan.  On February 1, 2011, she learned that AHL had still not made her November and December of 2010 deposits.  Dr. Usiak confronted Dr. Meehl and told him that it was illegal for him to withhold the retirement contributions.  Dr. Meehl stated that he would catch up as quickly as possible, and blamed his tardiness on the heavy snowstorms that had prevented Haley from performing the necessary bookkeeping services.  Dr. Meehl noted that AHL had always deposited its matching contributions in advance of their annual due date.  Rejecting the explanation, Dr. Usiak likened Dr. Meehl to the notorious Ponzi schemer, Bernie

---

[6] At his deposition, Dr. Meehl testified that AHL suffered from cash flow problems and he had made certain payments "strategically" in order to meet AHL's payroll.

[7] Dr. Usiak does not dispute that Dr. Meehl made these statements to her, but disputes that these were the true reasons for the tardy deposits.

Madoff. Later that day, as she left work early because of a snowstorm, Dr. Usiak encountered Dr. Meehl shoveling snow from the Hospital's steps. The argument over the late deposits resumed, and ended in a heated exchange.[8] By February 4, 2011, AHL had made all of the outstanding deposits to Dr. Usiak's retirement account, as well as an interest payment of $24.00 (as calculated by the Department of Labor's online Voluntary Fiduciary Correction Program).

On February 11, 2011, Dr. Meehl hand-delivered a termination letter to Dr. Usiak. The letter stated that "[Dr. Usiak] ha[d] made it clear that [she] no longer trust[ed] [Dr. Meehl] and [his] management when they spoke on January 6th and on February 1st regarding the hospital Simple IRA." Defs.' Ex. 1 at Ex. A. While acknowledging Dr. Usiak's frustration over the retirement plan deposits, the "comparison [to Bernie Madoff] [wa]s just too grievous an insult for [Dr. Meehl] to believe that [they] have a proper foundation on which to continue working together in the spirit of mutual trust and respect," and that "[a] lack of mutual trust ma[de] a successful working relationship impossible." *Id.*[9] AHL paid Dr. Usiak for all of the

---

[8] The parties disagree as to whether Dr. Usiak made further derogatory references to Bernie Madoff during this second conversation, and whether Dr. Meehl made it known to Dr. Usiak that he was offended by the comparison.

[9] In relevant parts, the letter stated:

You have made it clear that you no longer trust me and my management

4

time she had worked prior to the termination and reimbursed all of her accrued leave time.

On February 28, 2011, Dr. Usiak's lawyer wrote to AHL protesting her "unlawful" termination, and threatening a lawsuit in federal court if the wrong was not

---

when we spoke on January 6th and on February 1st regarding the hospital Simple IRA. I have made all necessary contributions to bring your account to date. In addition I instructed Brian [Haley] to use the Department of Labor's VFCP calculator (Voluntary Fiduciary Correction Program) to determine the additional amount to deposit into your Vanguard Simple IRA. This was done as a separate deposit and should be available to you when viewing your account online. Although not required to, all matching contributions have been made early at the same time as the voluntary portion. This has been done all along as a courtesy to you and other plan members.

When speaking with me February 1st, in giving expression to your disappointment, you likened me and my administration of the hospital's Simple IRA plan to that of the criminal sociopath Bernie Madoff. While I understand your frustration, this comparison is just too grievous an insult for me to believe that we have a proper foundation on which to continue working together in the spirit of mutual trust and respect. You should be well aware that my wife and I have gone to great lengths to insure the job stability and wellbeing of all employees. Doctors are well compensated and fully supported with a compliment of trained technicians and other support services. With the onset of the recession during the past few years we have provided this support at great personal sacrifice. LuAnn and I are both devastated by your comment.

As such, it is with no small measure of disappointment that I am informing you that the time has come for us to part ways and that effective today your employment with the Animal Hospital of Lynnfield is ended. A lack of mutual trust makes a successful working relationship impossible. . . .

5

redressed.  Dr.  Meehl responded on March 11, 2011, offering to reinstate Dr. Usiak.

Dr. Meehl wrote that while he and his wife had been offended by the Madoff slur, he

did "not believe terminating [Dr. Usiak's] employment was a tempered response to

[her] comment, especially in light of the allegations [Dr. Usiak's] attorney has made."[10]

*Id.* at Ex. B.  Dr. Meehl stated that it was "his intention to make the return easy for [Dr.

Usiak]."  *Id.*[11]   In addition, AHL voluntarily deposited $7,689.01 into Dr. Usiak's

---

[10] At his deposition, Dr. Meehl stated that he had no wish to be a defendant in
a lawsuit, and had made it a lifetime habit to negotiate amicably his differences with
others.  Moreover, he believed at the time he made the offer that Dr. Usiak wanted to
return to her job at AHL.

[11] In relevant part, the letters states:

I write to offer you immediate reinstatement to your position at the
Animal Hospital.  You may return to work with the same level of salary
and benefits you were paid on February 11, 2011.  Upon your return to
work the hospital will treat you as it treats every other member of the
professional staff.  The hospital does not require that you release it or
waive any claims you may have against it.  This offer is not an admission
of liability on the part of the hospital.  It is an example of our willingness
to move forward with you in a manner that is productive, fair and best
uses the hospital's resources.

On February 11, 2011, your last day of work, I informed the personnel of
the hospital of a staffing change.  I provided no reason for the change.  I
did not discuss with any of the staff other than Ms. Salsman [sic] the
reasons for your not working.  I am willing to discuss with you now an
explanation we both will provide to the staff upon your return.  My
intention is to make the return easy for you.

Having spent a scandal-free lifetime in this profession, my wife and I

checking account to compensate her for the time that she had missed from work.

Dr. Usiak rejected the offer of reinstatement and brought this lawsuit.[12]  Her Amended Complaint, filed in June of 2011, lists seven Counts – conversion (Count I),[13] breach of fiduciary duty (Count II), interference in violation of ERISA (Count III), retaliatory discharge in violation of ERISA (Count IV), wrongful discharge in violation of Massachusetts public policy (Count V), failure to timely pay wages in violation of the Massachusetts Wages Act (Count VI), and retaliatory discharge under the Massachusetts Wage Act (Count VII).  AHL and Dr. Meehl move for summary judgment on Counts II through VII, while Dr. Usiak moves for summary judgment on Counts II through IV.  The court heard argument from counsel on October 26, 2012.

---

were offended by your comparing me to the criminal sociopath Bernie Madoff.  However, I do not believe terminating your employment was a tempered response to your comment, especially in light of the allegations your attorney has made.

[12] In April of 2011, Dr. Usiak filed a Non-Payment and Wage and Workplace Complaint Form with the Fair Labor Division of the Office of the Massachusetts Attorney General.  Based on the parties' prior filings, the complaint appears to have been referred to the division of United States Department of Labor that handles ERISA matters, where it was satisfactorily resolved.  *See* Dkt # 25 at 9-10, Dkt # 26, Ex. 1 at 6.

[13] Dr. Usiak has since agreed to voluntarily dismiss Count I.  *See* Dkt # 33 at 1 n.2.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

*Cross-motions as to Count II – Breach of Fiduciary Duty*

With respect to this claim, the facts are not in dispute. As Dr. Usiak notes, Dr. Meehl, as the AHL retirement plan administrator, acts in a fiduciary capacity with respect to participating employees. *See* 29 U.S.C. § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such

8

plan."). Moreover, it is not disputed that Dr. Meehl breached his fiduciary duty by detaining account deposits, and using employee ERISA contributions to defray the operating costs of AHL. *See* 29 U.S.C. § 1109.

The issue, rather, is one of an appropriate remedy. Relief under ERISA is equitable in nature. *See Kamler v. H/N Telecomm. Servs., Inc.*, 305 F.3d 672, 681 (7th Cir. 2002) (to obtain equitable relief under ERISA, a "plaintiff must allege that the breach of fiduciary duty caused some harm to him or her that can be remedied."). Dr. Usiak acknowledges that as of February 7, 2011, all of the money that she was then owed had been deposited into her plan account. Because the account has been made whole, there is nothing further that Dr. Usiak may recover. *See* 29 U.S.C. § 1109(a) (recovery under ERISA for breach of fiduciary duty is limited to "any losses to the plan resulting from each such breach, and . . . any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary."). *See also Watson v. Deaconess Waltham Hosp.*, 141 F. Supp. 2d 145, 150 (D. Mass. 2001), *aff'd*, 298 F.3d 102 (1st Cir. 2002) ("[C]ompensatory damages are only available to restore a plan to its uninjured condition; individuals cannot obtain compensatory or punitive damages for breach of fiduciary duty.") (citations omitted).

Dr. Usiak's fallback contention is that she would not have withdrawn from the AHL plan had she not lost confidence in Dr. Meehl as a plan administrator and

therefore she deserves to be awarded the 3% matching contributions that she would have received had she remained in the plan from January of 2011 to the present. The argument founders on the fact that AHL's *matching* contributions were contingent on Dr. Usiak's continued participation in the plan. Having voluntarily withdrawn from the plan and then having refused reinstatement as an AHL employee, she has no right to be compensated for an opportunity that she herself decided to forfeit.

In the alternative, Dr. Usiak suggests that plan-wide relief is available to her because "recovery for a violation of [29 U.S.C. § 1109] inures to the benefit of the plan as a whole," *Massachusetts Mut. Life. Ins. Co. v. Russell*, 473 U.S. 134, 141 (1985), and Dr. Meehl's practice of diverting employee contributions undisputedly affected all plan participants. *Russell*, however, does not hold that an individual participant may recover personal damages for harms done to an entire plan. In *Russell*, the Supreme Court rejected a disability plan participant's claim for extra-contractual individualized damages in favor of the protection of contractually defined benefits for plan participants as a whole. *See id.* at 148. Moreover, *Russell* dealt with a defined *benefit* plan, and its "'entire plan' language . . . does not apply to defined *contribution* plans." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008) (emphasis added). AHL's Simple IRA is a defined contribution plan. "One defined contribution plan participant has no pecuniary interest in the accounts of another.  If a defined

contribution plan participant sues for a breach of fiduciary duty, his financial recovery must be entirely, and only, to his own accounts." *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 266 (D. Mass. 2008). Thus, as a matter of law, there are no further damages to which Dr. Usiak is personally entitled.

Finally, Dr. Usiak contends that notwithstanding that fact that her own account has been made whole, the court should impose plan-wide equitable remedies, presumably to prevent future harm to current plan participants. *See* 29 U.S.C. § 1109 (under ERISA, a breach of fiduciary duty is "subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."). The obstacle to this type of equitable remedy is the litigation approach that Dr. Usiak has taken. "Of course, a fiduciary's breaches can affect more than one defined contribution plan participant. In that situation, though, the proper approach is joinder of the affected participants or the certification of a class." *Bendaoud*, 578 F. Supp. 2d at 266. This is a sound rule because

> "third parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them." *Singleton v. Wulff,* 428 U.S. 106, 114 (1976). Where an ERISA plan participant suffers no personal injury as a result of a fiduciary's actions but instead purports to represent other participants, a court must be concerned that the plaintiff will not effectively represent the third party's interests.

*Id.* at 267.  Dr. Usiak brought this action on her own behalf, and not as the purported representative of other plan participants.  Nor can she seek prospective relief, as she is no longer a plan participant.  *See id.* at 267-268.  Because there is no further relief, equitable or otherwise, available to Dr. Usiak, defendants are entitled to summary judgment on Count II.

*Cross-motions as to Counts III and IV – Interference and Retaliation*

Counts III and IV are directly related to Dr. Usiak's termination from AHL – Count III alleges that she was fired as an interference with her entitlement to benefits under the Simple IRA, while Court IV alleges that she was terminated in retaliation for her assertion of her ERISA rights.  On Count III, Dr. Usiak "carr[ies] the burden of proving that [her] firing 'was taken with the specific intent of interfering with [her] ERISA benefits.'"  *Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 66 (1st Cir. 2008), citing *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir. 1995).  Similarly, on Count IV,  Dr. Usiak "must make a plausible showing of specific intent in order to survive summary judgment on an ERISA retaliation claim."  *Kouvchinov*, 537 F.3d at 67.

Dr. Usiak's interference claim fails as a matter of conceded fact.  She admits that prior to the date of her termination, all funds owing were deposited into her plan account, including a make-up interest payment.  She voluntarily withdrew from

12

participating in AHL's Simple IRA several weeks prior to her termination, and therefore was not entitled to any further benefits under the plan.  On these facts, there is no plausible theory linking her termination to any motive to deprive her of benefits under the Simple IRA.

With respect to the retaliation claim, Dr. Usiak proceeds on a potent showing of direct evidence – Dr. Meehl's termination letter clearly states that she was terminated for complaining about the untimely Simple IRA deposits.  While defendants argue that the termination had less to do with the substance of the complaint than with the offensive and insubordinate manner in which Dr. Usiak made it (twice), at the summary judgment stage, the court must draw all inferences in Dr. Usiak's favor.  Thus, there is a genuine dispute of fact (over Dr. Meehl's intent) that precludes summary judgment on the issue of liability.

Defendants contend that even assuming liability, Dr. Usiak is not entitled to any cognizable relief on either the interference or retaliation claim.  Again, ERISA provides only equitable relief.  *See* 29 U.S.C. § 1132(a)(3); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 221 (2002) (29 U.S.C. § 1132(a)(3), "by its terms, only allows for *equitable* relief.") (emphasis in original).  Defendants assert that under *Great-West*, back pay and front pay are not equitable remedies, and Dr. Usiak has refused AHL's offer of reinstatement, which was her only available remedy.  In *Great-*

*West*, the Supreme Court held that "[f]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214.

Although *Great-West* did not address the availability of money damages in a retaliation claim, the Tenth Circuit in applying *Great-West* found that backpay did not qualify as an equitable remedy under ERISA.

> The backpay Plaintiffs seek is a creature of positive law; that is, the remedy of backpay did not exist at common law. *See NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 48 (1937); *Bertot v. School Dist. No. 1, Albany County,* 613 F.2d 245, 250 (10th Cir. 1979) (en banc). Backpay claims, however, "do not differ remedially from the personal injury claim for lost wages, or the contract claim for past wages due[.]" 2 Dan B. Dobbs, *Law of Remedies* § 6.10(5) (1993); *see also* 1 George E. Palmer, *Law of Restitution* § 4.1 (1978 & Supp. 2003) (describing a claim for breach of personal services contract as sounding in quasi-contract for money damages). A backpay claim is remedially analogous to personal injury or breach of contract claims because backpay awards compensate employees for lost wages and benefits before trial. *Smith v. Diffee Ford-Lincoln-Mercury, Inc.,* 298 F.3d 955, 964 (10th Cir. 2002); 2 Henry H. Perritt, Jr., *Employee Dismissal Law and Practice* § 9.46 (4th ed. 1998); Robert Belton, *Remedies in Employment Discrimination Law* § 9.3 (1992); Dobbs, *Law of Remedies* § 6.10(5) at 227 n.15. Backpay is compensatory because the award is measured by an employee's loss rather than an employer's gain. *Id.*; *Ford* [*Motor Co. v. E.E.O.C.*]*,* 458 U.S. [219 ,] 229 [(1982)] (noting that "paying backpay damages is like paying an extra worker who never came to work"); *Albemarle Paper Co.* [*v. Moody*], 422 U.S. [405,] 440 [(1975)] (Marshall, J., concurring) (explaining that backpay under Title VII is generally computed by determining the amount of compensation lost as a direct result of the employer's discriminatory action).

14

*Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1252-1253 (10th Cir. 2004) (citations omitted).  Because "compensation is a purpose 'traditionally associated with legal relief' . . . [and] an award of money damages was the *traditional* form of relief offered in the courts of law[,] . . . a claim or backpay is 'almost an exemplar of a claim at law.'" *Id.* at 1253-1254.[14]

Dr. Usiak argues that because front pay is usually seen as a substitute for the equitable remedy of reinstatement, it is generally not considered to be a form of compensatory damages.  *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848-851 (2001).  While it is true that front pay may be awarded in lieu of reinstatement, this is done only in instances in which an employee's reinstatement is impractical or impossible.  *Selgas v. Am. Airlines, Inc.*, 104 F.3d 9, 12-13 (1st Cir. 1997).  In the usual case of an unlawful discharge, "the overarching preference is for reinstatement." *Id.* at 13.

Here, it is undisputed that Dr. Usiak refused Dr. Meehl's offer of reinstatement in March of 2011, prior to the filing of her lawsuit.  This refusal precludes any claim for ERISA-related damages post-dating the refusal.  "The availability of front pay as a remedy . . . presupposes that reinstatement is impractical or impossible due to

---

[14] Dr. Usiak's argument that a claim for damages may not be considered on summary judgment before liability has been established has no basis in law.

circumstances not attributable to the plaintiff.  It would be inequitable for a plaintiff to avail herself of the disfavored and exceptional remedy of front pay where her own []conduct precludes her from availing herself of the favored and more traditional remedy of reinstatement." *Sellers v. Mineta*, 358 F.3d 1058, 1064 (8th Cir. 2004). There was nothing impossible or impractical about reinstatement at the time the offer was made to Dr. Usiak.  She was offered a return to the same position with the same salary and benefits that she had enjoyed prior to the termination.  Dr. Meehl agreed that his prior conduct had not been "tempered" or proportionate to the offense that he had taken at Dr. Usiak's Madoff remark.  No apology or release was sought from Dr. Usiak as a condition of her reinstatement and Dr. Meehl promised to collaborate with her to ensure a smooth return to the workplace.  Nothing in the record suggests any "continuing hostility between the plaintiff and the employer or its workers, or . . . psychological injuries that the [termination] has caused the plaintiff" that would have made the prospect of a successful return to work impractical.  *Pollard*, 532 U.S. at 853.

With regard to back pay, most of the cases Dr. Usiak cites did not arise under ERISA and therefore do not apply to the "carefully crafted and detailed enforcement scheme embodied in the [ERISA] text that Congress has adopted." *Great-West*, 534 U.S. at 221.  In drafting ERISA, "Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Russell*, 473 U.S. at 146 (emphasis in

16

original).  Unlike Title VII, where Congress explicitly provided for the remedy of back pay in conjunction with equitable remedies, ERISA expressly omitted backpay as a form of relief.  *Great-West*, 534 U.S. at 218, n.4.

The cited cases allowing back pay as an ERISA remedy are  essentially one in number, *Schwartz v. Gregori*, 45 F.3d 1017 (6th Cir. 1995), accompanied by two district court cases that rely on its holding.  Although the Sixth Circuit in *Schwartz* "conclude[d] that the back pay awarded [t]here constituted restitution, and therefore [back pay] is an equitable remedy available under [29 U.S.C. §1132(a)(3)]," *id.* at 1022-1023, *Schwartz* predated *Great-West*.  Since *Schwartz*, the Sixth Circuit, guided by *Great-West*, has held that a court order including earlier laid-off employees in a Closure and Layoff Agreement that made them eligible for plant-closing benefits did not comport with any traditional equitable remedy, such as contract reformation or restitution, and was therefore not an available equitable remedy under ERISA. *Alexander v. Bosch Auto. Sys., Inc.*, 232 Fed. App'x 491, 496-501 (6th Cir. 2007).  In light of *Bosch*, it is doubtful that *Schwartz* survives *Great-West*, even in the Sixth Circuit.  Moreover, even if the *Schwartz* holding remained viable,[15] Dr. Usiak would

---

[15] The holding in *Great-West* (and *Millsap*) has been the target of judicial and scholarly criticism.  *See Crawford v. TRW Auto. U.S. LLC*, 560 F.3d 607, 616 n.1 (6th Cir. 2009); *Eichorn v. AT&T Corp.*, 489 F.3d 590, 591-594 (3d Cir. 2007).  As noted by the Court in *Bosch*, in certain cases the unavailability of back pay as a remedy can leave plaintiffs in the "unsettling phenomenon" of being "without a remedy that falls

not be entitled to recover as she accepted reimbursement of her full salary between the time of her termination and her rejection of the offer of reinstatement. Consequently, summary judgment will be granted to defendants on Counts III and IV.

*Defendants' Motion as to Counts V-VII – State Law Claims*

Defendants correctly contend that Dr. Usiak's state law claims – retaliatory discharge in violation of public policy (Count V), failure to timely pay wages in violation of the Massachusetts Wages Act (Count VI), and retaliatory discharge under the Massachusetts Wages Act (Count VII) – are preempted by ERISA. In crafting ERISA, Congress was emphatic in its intent to displace any conflicting state law on the subject. ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a). ERISA preemption turns on "(1) whether the Plan at issue . . . is an 'employee benefit plan' within the scope of ERISA, and if so (2) whether the [state law] 'relates to' the Plan." *Rosario-Cordero v. Crowley Towing & Transp. Co.*, 46 F.3d 120, 124 (1st Cir. 1995).

Dr. Usiak in the first instance does not dispute that AHL's Simple IRA is an employee benefit plan under ERISA. As to the second prong of the preemption test,

_____

under the rubric of 'appropriate equitable relief' as permitted under ERISA." *Bosch*, 232 Fed. App'x at 501. At the same time, it is up to "Congress or the Supreme Court to reconsider the interplay between the extent to which make-whole monetary relief is available under 29 U.S.C. § 1132(a)(3) and the preemption of state-law causes of action that could accord that relief." *Eichorn*, 489 F.3d at 593-594.

> a law 'relates to' an employee benefit plan, in the normal sense of the
> phrase, if it has a connection with or reference to such a plan.  Under this
> "broad common-sense meaning," a state law may "relate to" a benefit
> plan, and thereby be pre-empted, even if the law is not specifically
> designed to affect such plans, or the effect is only indirect.

*Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990).  In applying the

relatedness prong, the Supreme Court "ha[d] no difficulty in concluding that . . . a claim

that the employer wrongfully terminated plaintiff primarily because of the employer's

desire to avoid contributing to, or paying benefits under, the employee's pension fund

. . . 'relate[s] to' an ERISA-covered plan within the meaning of [29 U.S.C. § 1144(a)],

and is therefore pre-empted."  *Id.* at 140.  As Dr. Usiak's state-law claims arise from

the same nucleus of related facts stemming from her disagreement with Dr. Meehl's

loose administration of AHL's Simple IRA, they are similarly preempted.[16]

---

[16] Dr. Usiak concedes that the finding that AHL's Simple IRA qualifies as an
employee benefit plan under ERISA precludes prosecution of her wrongful discharge
claim (Count V).  *See* Pl.'s Opp'n at 18 n.11.  However, she argues that her Wage Act
claims are not preempted because ERISA expressly excepts "generally applicable
criminal law of a State" from the scope of preemption.  29 U.S.C. § 1144(b)(4).  As the
Massachusetts Supreme Judicial Court has convincingly held, "[b]ecause [the Wage
Act] is limited to the nonpayment of 'wages' by an employer to an employee," it "is
not so general as to fall within the exception to preemption provision provided by
Congress [in ERISA]."  *Commonwealth v. Morash*, 402 Mass. 287, 297 (1988), *rev'd
on other grounds*, 490 U.S. 107 (1989).  Moreover, Dr. Usiak's case is a civil action,
not a criminal prosecution (as contemplated by the ERISA exception).

ORDER

For the foregoing reasons, Plaintiff's motion for summary judgment as to Counts II to IV is <u>DENIED</u>.  Defendants' motion for summary judgment as to Counts II to VII is <u>GRANTED</u>.  The Clerk will enter judgment for defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____

UNITED STATES DISTRICT JUDGE